(No. 18605.—Decree affirmed.)
JOSEPH F. PETERS, JR., Appellee, *vs.* GEORGE L. FEKETE, Admr., *et al.* Appellants.

*Opinion filed February 24, 1928—Rehearing denied April 5, 1928.*

1. WILLS—*allegation of unsoundness of mind presents issue of insane delusion.* In a will contest the allegation of unsoundness of mind and memory presents the issue of incapacity by reason of insane delusions, and an insane delusion affecting the disposition of the testator's property may consist of an intense hatred for his only son and heir for which the proof shows no justification.

2. SAME—*undue influence may be established by circumstantial evidence.* Undue influence may be established by circumstantial evidence if the circumstances are inconsistent with the absence of undue influence.

3. SAME—*when motion to direct verdict for proponents is properly refused—review.* In a will contest, a motion to direct a verdict for the proponents at the close of all the evidence presents the question whether there is any evidence fairly tending to prove the allegations of the contestant's bill, and where there is such evi-

dence and the evidence on the whole is conflicting the motion is properly refused, as the trial court cannot weigh the testimony to determine its preponderance, and if the verdict is not clearly contrary to the weight of the evidence it must be regarded as conclusive on review.

4. SAME—*burden of proof is on the proponent in a will contest.* Where the proponent in a will contest makes a *prima facie* case the burden of proof does not shift to the contestant but is always on the proponent, as the jury must determine from the whole evidence whether the instrument offered is the will of the testator.

WRIT OF ERROR to the Circuit Court of St. Clair county; the Hon. LOUIS F. BERNREUTER, Judge, presiding.

JOSIAH WHITNEL, and H. L. BROWNING, for appellants.

JAMES O. MILLER, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

The bill in this case was filed to contest and set aside the will of Joseph F. Peters, Sr., which was executed August 26, 1925. Peters died on March 26, 1926, at the age of about sixty-two years, and left surviving him complainant, Joseph F. Peters, Jr., his son and only heir. Testator's wife died in June, 1922. He had been employed in East St. Louis as a watchman in the yard of the Cotton Belt Railway Company, where his duties were to protect the company's property and to check cars and seals received from connecting lines and make reports of them. His hours were from seven P. M. till seven A. M. W. E. McGraw was general superintendent of the railroad testator worked for, and Bert McGraw was the yardmaster. By his will testator directed, first, that his debts and funeral expenses be paid; second, he bequeathed to contestant five dollars, and stated that "this bequest is made because of lack of affection that he has borne me and because that on several occasions he has attempted to take my life and because he has caused trouble between me and my wife, resulting in our separation for a period of six years;" third, he devised

to Bert McGraw a house and lot described in the will; fourth, he directed that his body be buried alongside his wife and that his funeral expenses should not exceed $600; fifth, he devised and bequeathed to W. E. McGraw all the residue of his estate, real, personal and mixed; sixth, he nominated Thomas L. Fekete, Jr., of East St. Louis, to be executor of the will without bond. After the will was admitted to probate this bill was filed to contest it and set it aside.

The bill alleges the testator was not of sound mind, and was suffering from disease which impaired his faculties so as to render him incapable of making a valid disposition of his property by will. It also charges that the defendants, devisees and legatees, exercised fraudulent practices and resorted to falsehoods and misrepresentations to testator to induce him to execute the will, and that he was, in fact, under duress and improper restraint and undue influence of the two McGraws and the attorney who drew the will, at the time it was executed. Defendants answered the bill separately, denying all material charges therein. An issue was made up and submitted to the jury whether the instrument in question was the last will and testament of Joseph F. Peters, Sr. The jury found it was not his last will and testament, and the court entered a decree upon the verdict that the instrument and its probate be set aside and declared null and void. Proponents of the will have prosecuted an appeal from that decree to this court.

The will was prepared by attorney Fekete in his office on the day it was executed. Testator went to the attorney's office alone. After the will was prepared it was witnessed by a young woman stenographer employed by the attorney, and a girl friend of hers who was assistant book-keeper and stenographer for a business firm. Upon the question of undue influence charged in the bill there is no evidence showing the exertion of such influence at the time the will was prepared and executed. The charge in the bill is that the

will was the product of a fraudulent conspiracy between the McGraws and the attorney who drew the will, and that to induce the testator to execute it they threatened to discharge him from his position with the railway company, but promised if he would execute it to carry him on the payroll as an employee as long as he lived; that testator was past the service-age rule of the railway company, which was known to the McGraws, and testator, under their influence, agreed to and did make the will.

The proof both on behalf of proponents and contestant shows that testator had an intense hatred for his son, and frequently said his son should not have any of his property. He also frequently expressed his friendship for the McGraws and his intention of leaving his property to them. He said he had made a deal with them by which he was to have a lifetime job in exchange for his property. One of contestant's witnesses, Mrs. Clark, who testified she had lived in one of testator's properties more than a year, testified that he told her one morning he had eaten breakfast with McGraw in his private car. That was some time in 1925, but she could not fix the date. He told her he had made a will. He seemed greatly elated and said everyone else would be jealous. Another witness testified testator said he had willed his property to the McGraws and made arrangements for a lifetime job.

At the close of the case the proponents asked the court to take from the jury the issue of conspiracy and undue influence, but the court refused to do so, and at the close of all the evidence the court denied an instruction of proponents directing the jury to find the will was the last will and testament of Peters.

Proponents assign as errors the overruling of their motion for a new trial, the refusal to withdraw from the jury the issue of undue influence and conspiracy, the refusal to instruct the jury to find the instrument in question was the last will and testament of Joseph F. Peters, Sr., the admis-

sion in evidence of improper and incompetent testimony, and the giving of each of the twenty-three instructions given on behalf of the contestant.

As usual in cases of this character, the evidence upon the question of testamentary capacity was conflicting. The testimony of proponents on that question included the evidence of three witnesses who worked in the railroad yards with testator, a doctor who had known him many years and treated him in July, 1924 or 1925, the attorney who drew the will, the young women who witnessed it, and others who had known him for a long time and some of whom had done business with him or for him and testified he was of sound mind and memory at all times.

The witnesses for contestant, some of whom lived near testator and all of whom met him frequently, testified they had known testator for a considerable period of time and that he was of unsound mind before and at the time the will was executed. Some witnesses for contestant testified testator was intoxicated a great deal of the time, while others for proponents testified they never saw him intoxicated. Mrs. Clark, who lived in one of testator's houses more than a year, testified he always had guns strapped around him about the place and never went out without them. He would have one in front and one on each side, and sometimes a shot-gun in his arms. He came to breakfast at witness' house with three guns on him. It was not more than fifty feet from her door to his. He ate his meals with her all the time she lived there. His eyesight was bad and she would read his letters for him. He had five dogs in his yard and would parade around every day with his dogs and guns. He talked to himself and said he had a private graveyard. She said she did not know how many men testator said he had killed. He would come to breakfast and say, "I killed another bum last night."

Clarkson, a witness for contestant, testified he lived just across the alley from testator's property two years and was

well acquainted with testator; that he worked two years, 1923 and 1924, in the Cotton Belt yards with testator. He knew nothing about his home life. He carried a big gun in front of him on and off duty, on the street and around home. He had three large vicious dogs and they were always around him. Witness never saw testator when he was not armed. He would parade around and mutter to himself. Witness thought him a very rabid man, unreasonable, and he "bullified everybody." Witness thought him half crazy. On some subjects he seemed smart.

Another witness testified he lived about a block from testator's house. He met and talked with him very often and had been at his house. He had a habit of having guns and carried them everywhere he went. On one occasion witness went with him to a tailor shop to buy a pair of pants, and testator had his guns on him—one on each side and a black jack in the center. He seemed afraid everybody was going to rob him. He told witness to be prepared to meet bank robbers. He said they were all bad people in East St. Louis and liable to stick you up anywhere if they thought you had money. He had a drove of dogs— from three to six. Sometimes he walked to his work with his guns and dogs with him. He said the dogs saved his life. Contestant was not living with testator and his mother then but would make trips home to see his mother every two or three months. Testator would tell witness his son came to see him; that they had a quarrel and that he had no use for the boy; that he was going to put him in jail and send him to the penitentiary; that he hated the boy and was not going to leave anything to him. Testator's eyesight was very bad. He said McGraw was going to take care of him but said nothing about a will.

Another witness testified he lived about half a block from testator's property and lived there seven years. He was acquainted with testator and frequently was at his house. He worked for testator a little in fixing a fence.

He had previously worked for the Cotton Belt railroad but had been laid off and went to farming. In the fall of 1925 he met testator and testator asked him if he wanted a job as watchman under him; that he had made arrangements with McGraw; that he had a lifetime job, and that if witness wanted a job he could work under the testator. He never told witness what his arrangement with McGraw was.

The witness Mrs. Clark, before referred to, testified testator told her he was engaged once to marry Mrs. Meyers. Witness asked him why he didn't marry her, and he replied she was a woman that wouldn't stay at home and he would have to shoot her. He kept dogs in his back yard and bought meat for them every day. When he went out the dogs followed him, and he had his guns strapped on him. He would go to the street car and the dogs would go home when he got on the car. Testator did not sleep very much and was always telling witness how much property he had. Witness heard testator propose marriage to a Mrs. Layman on the morning he bought some property from her. She accepted and wrote him a letter later on, trying to force him to comply with his promise. He brought the letter to witness. It scared testator very badly, and he made six or eight trips to see witness and asked if she thought they would have him arrested. He tried to marry a Mrs. Crawford, but said he found out she chewed tobacco and he could not have her about the place. Witness heard him propose to several along the street as they passed the porch where he was sitting. Witness testified testator always wanted to kill somebody—his son especially. That was the reason she left testator's property. One night he went in the garage and drew his gun on witness' son, thinking it was his son. He seemed to be in constant fear of men in the Cotton Belt yards and also of his neighbors burning his property. He said he would kill his son if he got sight of him or found him on his premises;

that he would have killed him in the funeral car if it had not been on the way to his mother's funeral.

Testator stated in his will that his son had attempted to take his life and had caused his separation from his wife for a period of six years. The evidence does not show whose fault it was that he and his son did not get along well. Proponents proved that in 1922, after the death of testator's wife, he caused his son to be arrested by the police of East St. Louis but did not prosecute him, and the son was released after being in jail a while. The policeman who arrested the son said testator complained that his son had threatened his life and he was afraid of him. Testator said the son had stolen the wedding ring off the finger of his mother while she lay a corpse. A Mrs. Meyer, a witness for proponents, who had known testator for thirteen or fourteen years and testified to his sanity, testified that while she, Mrs. Warson and several others were sitting by the corpse of Mrs. Peters, contestant came in, removed a ring from his mother's finger and walked out. She said she had heard quarrels between the father and son and heard the son threaten to blow his father's brains out. She testified contestant had plenty of guns. Mrs. Warson, whom Mrs. Meyer mentioned as present when contestant took the ring from his mother's finger, testified that when the undertaker went to close the coffin lid the son asked him to take his mother's ring off, and he did. Kurrus was the undertaker, and after he took the ring off the mother's finger he handed it to the son. The body was then ready to be taken to the hearse. Mrs. Peters died in 1922. The policeman who arrested contestant testified the latter's father sent to the station the following day a good-sized trunk, which contained three or four pistols and some rifles and shot-guns. After the discharge of contestant the trunk was taken away, with the guns, by a baggageman. It is by no means clear that the trunk and guns belonged to contestant. His father had guns—plenty of them, according

to the testimony of witnesses—and when he did not have them on his person or in his hands some of them were in a trunk. The charge of the father and the testimony of one witness that the son had stolen the ring off his mother's finger while she was a corpse was certainly a mistake. The story was magnified out of the son's asking the undertaker to remove the ring before the corpse was buried, and in the presence of several persons the undertaker did so. No blame can be attached to the son for desiring to keep his mother's wedding ring as a memento. The statement in the will that the son had caused his father and mother to separate for six years is not borne out by the testimony. They were separated for a year and a half or two years, but what caused the separation is not shown by the testimony. Such incidents as the charge that the son stole the ring off of his dead mother's finger and that he caused his parents to separate for six years seem to have been magnified in a large degree. The amount of property owned by testator was not great. The inventory offered in evidence by proponents valued the real estate at $4600 and the personal at $75. The real estate consisted of two houses and lots. The proof abundantly shows the hatred of testator for his son, but also leaves much doubt on the question as to whether the son's conduct justified or caused it. Testator many times expressed his intention to leave his property to the McGraws, who were in no way related to him except as his employers. He said they were going to take care of him for life and he intended leaving them all his property. His wife had died some three years before he made the will, and so far as the record shows he had no relatives other than his son. As we have said, the proof does not show, when all considered, that the son deserved his father's hatred. It may have resulted from an insane delusion, without justification. At least the proof leaves that question, we think, proper to be submitted to a jury, as the allegation of unsoundness of mind and memory pre-

sents the issue of incapacity by reason of insane delusions. *American Bible Society* v. *Price*, 115 Ill. 623; *Snell* v. *Weldon*, 243 id. 496.

The court refused to withdraw from the jury the question made by the allegations of the bill, of conspiracy and undue influence. We are not prepared to say the court erred in doing so, although the evidence leaves much doubt on that question. Undue influence may be established by circumstantial evidence if the circumstances are inconsistent with the absence of such undue influence. *Waterman* v. *Hall*, 291 Ill. 304; *Blackhurst* v. *James*, 293 id. 11.

There was no error in refusing to direct a verdict in favor of proponents at the close of all the evidence. Such a motion presents the question whether there is any evidence fairly tending to prove the allegations of contestant's bill. If there is any evidence fairly tending to sustain the bill the trial court cannot weigh the testimony to determine its preponderance. (*Geiger* v. *Geiger*, 247 Ill. 629.) When the testimony is conflicting on the question of mental capacity and the verdict is not clearly contrary to the weight of the evidence the verdict must be regarded as conclusive. *Turckheim* v. *Birkley*, 287 Ill. 434.

Proponents insist the burden of proof was on them to prove testamentary capacity by a *prima facie* case, but that when they had done that the burden shifted to contestant and required him to establish unsoundness of mind by a preponderance of the evidence. This question was under consideration by this court in *Donovan* v. *St. Joseph's Home*, 295 Ill. 125. In that case the court held, when the proponent in a will contest makes a *prima facie* case the burden of proof does not shift to the contestant but is always on the proponent, as the jury must determine from the whole evidence whether the instrument offered is the will of the testator. That case was followed and approved in *Carroll* v. *Eckley*, 305 Ill. 367, *Sellers* v. *Kincaid*, 303 id. 216, and other cases which might be cited.

Both parties have made some claim that the court admitted incompetent testimony, but if the testimony complained of was incompetent its character was so unimportant that it could not have influenced the verdict, and we do not think it necessary to discuss that objection in detail.

At the request of contestant the court gave twenty-three instructions, all of which are criticised by proponents. No such number of instructions was required to present to the jury the law governing the case, but we are unable to say that any of them contain errors which require a reversal of the decree, and it is affirmed.

*Decree affirmed.*